UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
DAFENG HENGWEI TEXTILE CO., LTD., :
:
                Plaintiff, :
: **OPINION AND ORDER**
                -against- :
: 13-CV-5829 (PK)
ACECO INDUSTRIAL & COMMERCIAL :
CORPORATION, ACECO, INC., DAVID LIU :
a/k/a DAVID Z. LIU a/k/a ZUOWEI LIU, and :
CHAN-ZHU YU a/k/a CEE CEE YU, :
individually, and as agents of Aceco Industrial & :
Commercial Corporation and Aceco, Inc., :
:
                Defendants. :
---------------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

      Plaintiff Dafeng Hengwei Textile Co., Ltd. ("Plaintiff") brought suit against corporate Defendants Aceco Industrial & Commercial Corporation ("AIC") and Aceco, Inc. ("Aceco") and individual Defendants David Z. Liu ("Liu") and Chan-Zhu Yu ("Yu") (together with Aceco and AIC, "Defendants") in a breach of contract action. (See Compl., Dkt. 1.) Plaintiff is a Chinese corporation that manufactures textiles in the city of Dafeng, China. From 2009 to 2012, it sold bedsheets to Aceco, a company based in the United States. Aceco then supplied the bedsheets to American retailers such as K-Mart. (Tr. II[1] at 79-81.)

      Beginning in 2012, Aceco failed on multiple occasions to pay invoices it owed to Plaintiff. Liu and Yu, on behalf of Aceco, repeatedly promised Plaintiff that the invoices would be paid, and based on these representations, Plaintiff continued to ship its goods to Aceco customers. The last payment made by Aceco to Plaintiff was on July 25, 2013. After 57 invoices sent by Plaintiff to Aceco during 2012 and 2013 went unpaid, Plaintiff brought this lawsuit on October 24, 2013.

---

[1] The June 13, 14, and 15 trial transcripts are referred to respectively as "Tr. I," "Tr. II," and "Tr. III."

After extensive discovery, the parties cross-moved for summary judgment. District Judge Margo K. Brodie denied Defendants' motion and granted Plaintiff's motion with regard to its breach-of-contract claim, holding that Aceco and AIC owe Plaintiff $1,977,642.02, and dismissing Defendants' counterclaims. In doing so, Judge Brodie rejected Defendants' claim that payments made by Aceco to Plaintiff in 2012 and 2013 satisfied the amounts due. Defendants' counsel conceded at oral argument that these payments were for *previously* incurred invoices, leaving the 57 invoices at issue unpaid. On the question of piercing the corporate veil, however, Judge Brodie denied Plaintiff's Motion for Summary Judgment, finding genuine issues of material fact.

The parties consented to jurisdiction of the magistrate judge, and a bench trial was held on June 13, 14, and 15 of 2016. The sole issue at trial was whether Plaintiff can pierce the corporate veil to collect the outstanding judgment directly from Liu and Yu, Aceco's sole shareholders.

## DISCUSSION

I.  **Findings of Fact**[2]

   A. *Corporate Background*

AIC and Aceco, Inc. are New York corporations, incorporated in 1976 and 1989, respectively. According to Yu, Aceco owns AIC. (Tr. I at 24.).

Since September 2012, Liu and Yu, who are married to each other, have been the sole shareholders, directors, and officers of Aceco. (Tr. I at 17.) Since 2013, they have also been Aceco's only full-time employees. Yu is President, and Liu is Vice-President for sales and quality control. (Tr. II at 109.) By their own accounts, they control all of the company's decisions, including what merchandise to purchase, what payments to make to which vendors, and bookkeeping.[3] (Tr. I at 32-

---

[2] To the extent to which there appear to be contradictions within the evidence introduced, these Findings of Fact also constitute the Court's credibility determinations.

[3] Yu claimed that the banks and Aceco's factor also had decisionmaking authority over the company. However, she clarified that the bank only had "authority" to the extent that loans from the bank had to be repaid on a regular basis. (Tr. I at 33.) And the factor's only role was to collect Aceco's accounts receivable and advance that amount to Aceco,

2

33 & 37-38.) No evidence was adduced at trial indicating any separate corporate structure for AIC. Indeed, bank statements show that money flowed freely between Aceco and AIC.

Liu and Yu testified that Aceco and AIC have no money and are unable to pay not only the $1,977,642.02 judgment against Aceco and AIC in this case, but also the judgment against Aceco in another case in this district for $1,066,874.88, plus disbursements, costs, and post-judgment interest.[4] Liu and Yu argue, however, that Aceco is not technically insolvent because it has "goodwill" and outstanding accounts receivable. However, they concede that their self-valuation of "goodwill" at two to three million dollars before the lawsuit is no longer valid. (Tr. II at 9.) They have also made no effort to collect any accounts receivable.

B. *Money Paid by Aceco*

Since at least 2009, money was transferred out of Aceco's bank accounts to individuals and entities, with no legitimate business purpose. Aceco made regular disbursements to pay off personal loans taken out by Liu and Yu, as well as by their friends. In addition, numerous payments went directly to family and close friends, and to entities controlled by Yu and Liu, their family and close friends. These payments amount to hundreds of thousands of dollars, although the exact total cannot be discerned because Defendants kept, or at least produced during discovery and trial, records that were incomplete and confusing.

Liu and Yu describe most of these payments from Aceco's funds as repayment for the principal and interest on loans purportedly made by these individuals or entities to Aceco. However, they concede that there are no written loan agreements or promissory notes supporting the existence of these alleged loans. In the absence of such documentation, Liu and Yu rely instead on a

---

minus the factor's fee. (Tr. II at 38.) The fact that Aceco had these outside obligations did not confer "control" on the bank or factor.
[4] *Shaoxing Aceco Blanket Co. v. Aceco, Inc.*, 13-CV-4937 (LDW)(GRB), Dkt. 34. The Court notes that the U.S. Court of Appeals for the Second Circuit affirmed the judgment of the District Court on November 3, 2016. *See Shaoxing Aceco Blanket Co. v. Aceco, Inc.*, --- F. App'x ---, 2016 WL 6518862 (2d Cir. Nov. 3, 2016).

3

smattering of bank records, such as monthly statements, checks, memo lines, and deposit slips. Some of the fund transfers described at trial are discussed below.

1. Payments for Liu and Yu Personal Loan

In 2003, Liu and Yu took out a personal loan in the amount of $498,000.00. From January 2009 to January 2014, Aceco paid a total of $217,167.12 for the principal and interest on that loan, of which $67,642.08 was paid during the period when Dafeng issued the 57 invoices which Aceco failed to pay (*i.e.,* July 10, 2012 to November 1, 2013). (Pl.'s Exhs. 19, 19A.)

Liu and Yu were fully aware of these payments, but contend that Aceco was paying back this loan because "Aceco is the one that's utilizing, using the funds, the money." (Testimony of Liu: Tr. III at 68-69; Tr. II at 15.) However, they produced no documentation of Aceco doing so. The only documents they produced to support their contention that the loan amount was given to Aceco for its use were a check dated April 21, 2000 from Liu and Yu's joint bank account to Aceco in the amount of $120,000.00 (Defs.' Exh. D), and two checks from Yu to Aceco, one dated September 27, 2012 for $150,000.00, and the other dated December 12, 2012 for $120,000.00 (Defs.' Exh. G). These three checks were issued several years before and after Liu and Yu took out the personal loan, and in any event, they do not add up to $498,000.00. Furthermore, in Aceco's tax return for 2012, nothing close to this loan amount was listed as a shareholder loan. Instead, amounts of $37,500.00 and $46,862.00 are listed for shareholder loans at the beginning and end of 2012, respectively. (Pl.'s Exh. 8, Schedule L; Tr. III at 72-73.) By contrast, bank statements show that the outstanding amount of the personal loan in July 2012 was $295,861.61, and in December 2012 was $281,384.90. (Pl.'s Exh. 19.) Liu and Yu failed to produce any accounting of this alleged loan from them to Aceco, either from their personal records or Aceco's corporate records.

2. Payments for Liu and Yu Home Equity Line of Credit

Liu testified that he and Yu took out a personal home equity line of credit ("HELOC"),

4

although he could not remember when they took out the HELOC, or even for what amount. (Tr. II at 114, 127.) No documentation was introduced at trial supporting the date, amount, or payment terms of the alleged HELOC.

Liu claimed that he was paying approximately $400.00 or $420.00 a month for interest on the HELOC, but he admitted, "If I'm not around, if I'm on business, occasionally the company would pay on our behalf, on my behalf." (Tr. III at 105.) Even when Liu himself made monthly interest payments on the HELOC, Aceco would "reimburse" him for those payments. (Tr. III at 106.) These payments were "paid on so many occasions over so long a period" that Liu could not even state how much Aceco paid. (Tr. III at 107.)

Liu tried to justify these payments from Aceco on the basis that he and Yu gave the HELOC funds to Aceco. In support of this, Liu presented a check in the amount of $168,000.00 made out to Aceco, signed by him, and dated October 20, 2008, along with a deposit slip and receipt, both dated October 22, 2008. (Defs.' Exh. C; Tr. II at 114-116.) The check does not indicate from whose account the money is drawn, although Liu claimed it was from the HELOC account. A handwritten notation at the bottom of the photocopy of these three documents states, "from Cici [Yu] & David's home equity line loan to ACECO Inc." However, the notation appears to have been written after the fact, and is not credible evidence justifying Aceco's repayment of the HELOC on behalf of Liu and Yu.

### 3. Payments for Li and Tang Personal Loan

Aceco also made payments on a personal bank loan taken out by former Aceco shareholder and employee Mo Dai Li and his wife Qi-Kun Tang. (Li, along with Liu's brother, were the two other original shareholders of Aceco.) Liu testified that he was fully aware of these payments. (Tr. II at 15.) Li, who is also a close personal friend of Liu and Yu, took out a personal bank loan in 2003, together with Tang, in the amount of $430,000.00. (Tr. III at 122.) From January 2009 to

5

January 2014, Aceco paid $187,513.39 for the principal and interest on that loan, of which $58,405.81 was paid from July 10, 2012 to November 1, 2013. (Pl.'s Exhs. 20, 20A; Tr. III at 121.) No documentation was presented in support of Liu and Yu's contention that this loan was for the use of Aceco. The sole evidence introduced at trial was a check dated January 30, 2012 from Li and Tang's joint account to Aceco in the amount of $80,000.00. (Tr. II at 145; Defs.' Exh. K, at Bates 225.) This check is for far less than the $430,000.00 amount Li and Tang received as a loan from the bank, and also less than the $187,513.39 that Aceco paid on their behalf. There was no legitimate business purpose for Aceco to pay off this personal loan.

4. Payments to Rockaway Associates

Aceco made payments to Rockaway Associates ("RA"), a general partnership real estate holding company organized in New York, in which Liu and Yu were two of the original partners. In an agreement dated September 28, 2012, Liu and Yu gave up all their rights in RA and two-thirds of their capital in RA to Li. In exchange, Li gave up his one-third share in Aceco. Through this transaction, Li got "full control" of RA. (Pl.s' Exh. 26.)

Between July 2012 and November 2013 Aceco transferred $132,058.40 to RA. (Pl.'s Exhs. 16, 16A.) In addition, on February 2, 2010, Aceco wired $420,000.00 to RA. (Pl.'s Exh. 22A.) Yu claimed that these payments constituted repayment of a loan Aceco made to RA, but no proof was ever presented that such a loan existed. (Tr. I at 42.) There was no legitimate business purpose for these payments to RA.

5. Payments for Rockaway Associates Mortgage

RA owned two properties for which Aceco served as guarantor on the mortgage. One, identified as the Gracewood property, had a mortgage of $1,480,000.00, and the other, identified as the Plandome property, had a mortgage of $530,000.00. According to bank statements, in 2013, Aceco made ten mortgage payments on behalf of RA on the Gracewood property, totaling

6

$86,204.20, and eleven mortgage payments on the Plandome property, totaling $33,957.44. (Pl.'s Exhs. 18, 18A.) Aceco had no legal interest in either of the properties, and these mortgage payments were not part of Aceco's obligations as guarantor on the mortgages. (Mortgage Agreement, Pl.'s Exh. 11.) Liu testified that he and Yu used Aceco funds to pay off those loans "because Aceco had used that money." (Tr. II at 31.) Liu claimed that Aceco secured a "blanket loan" or line of credit of two million dollars in 2003, which RA paid off. Thus, Aceco was simply paying RA back for this money. (Tr. II at 32.) No evidence of the blanket loan was received in evidence. There was no proof that RA ever lent money to Aceco that would justify these combined $120,161.64 in mortgage repayments on RA's behalf.

      6. <u>Payments to Kings Point Mart</u>

Kings Point Mart, LLC ("KPM") is a limited liability real estate holding company organized in New York in 2009, which until late 2012 was owned by Liu, Yu, and their friend Li. After all three sold their interests in the company, their friend Yu Hui "Grace" Chen owned KPM. (Tr. II at 126-129, 130.)

Aceco paid an unspecified amount of money to KPM. Liu and Yu described those payments as "rent" for Aceco's use of the property at 83 Steamboat Road. However, Aceco contributed money toward the purchase of that property and was also a guarantor on the mortgage for the property. Aceco never got that money back from KPM. Liu testified, "I can provide all of the proof" to show that Aceco's investment from the KPM sale was returned to it. (Tr. III at 61.) However, no such proof was provided.

Instead, Liu and Yu pointed to checks made out to Aceco, which they claim constituted repayment of the money Aceco paid to KPM. There are two checks from Yu Hui Chen, one dated September 27, 2012 for $150,000.00 and another dated December 12, 2012 for $120,000.00. (Defs.' Exh. G.) This combined $270,000.00 was allegedly money returned to Aceco for its investment in

7

KPM. Yu described a convoluted financial arrangement: "The investor purchased, or bought Kings Point Mart. However, Aceco was the party that actually funded the purchase of [KPM] and that's why after the property was sold, the money was returned to Aceco Inc." (Tr. II at 129.) Liu testified that the two checks were only "partial" evidence that KPM had returned Aceco's $500,000.00 investment to Aceco. When pressed for that additional evidence, however, Liu conceded, "I don't have it now." (Tr. III at 80.) Thus, there was no evidence that KPM paid Aceco fully for Aceco's investment in property owned by KPM.

       7. <u>Payments to Manhasset Evergreen Realty/Vicky Zhang</u>

Vicky Zhang (a/k/a Yuk Mui Chan) is married to Yu's son Fan Zhang, and owns Manhasset Evergreen Realty Corp. ("MER"). (Tr. I at 113.) From November 4, 2008 through December 20, 2012, Aceco paid $152,580.00 to MER. (Pl.'s Exh. 27A.) Liu and Yu characterize these as payments to Vicky Zhang for her services as a licensed real estate broker, although there is no documentation of a consulting fee for KPM's real estate purchases, or that Vicky Zhang is actually a licensed real estate broker. (Tr. I at 111-112.) At the same time, Liu and Yu also contradict themselves by contending that these were payments for interest on a loan to Aceco. In support of that justification, they introduced a letter captioned "Re: Personal Loan Interest Agreement," dated January 1, 2008, that states, "Aceco Inc. and Fan Zhang & Yuk Mui Chan agreed the interest rate at 8% annually for the loan amount of $436,342.46 to Aceco Inc since the year of 2000." (Pl.'s Exh. 28.) In that letter, Aceco agrees to pay $2,900.00 per month to MER starting on January 2008, reflecting "the personal loan amount plus past due interest amount…." (*Id.*; Tr. II at 70.) Curiously, this "agreement" was dated 2008 despite reflecting a supposed loan in 2000.

A check dated November 4, 2008 reflects a payment of $87,000.00 from Aceco to MER, equivalent to 30 payments of $2,900.00. Thereafter, various checks and online transfers from December 2008 to April 2009 show monthly payments of either $2,900.00 or $5,800.00 to MER,

8

followed by a payment of $2,900.00 on August 5, 2009. These payments are variously described in the check or transfer memo line, if at all, as "Consultation," "Consultation & Management," or "Service Retainer." (Pl.'s Exh. 27.) Beginning on April 19, 2010, there are additional payments to MER for random amounts – such as $20,000.00, $1,000.00, and $2,500.00 – that are variously described in the check or tranfer memo line, if at all, as "Commission" or "Service Retainer." None of these checks and transfers to MER identify themselves as "interest." Nevertheless, Yu insisted that at least some of these payments constituted interest for a $400,000.00 loan Vicky Zhang supposedly made to Aceco at an interest rate of 8.7%. This flatly contradicts Yu's own testimony – and the memo lines on the checks themselves – that these were consultation fees. (Tr. I at 112; Tr. II at 51.) In any event, no credible evidence was introduced to support any loan.

       8. <u>Payments to Li and Mei</u>

In 2013, Aceco made payments totaling $15,559.01 to Li. (Pl.'s Exh. 25A.) In addition to being a shareholder, Li had also been employed in the accounting department at an annual salary of $90,000.00 to $95,000.00. (Tr. I at 106.) Yu testified at her deposition that she and her husband were the *only* Aceco employees after 2012. (Tr. I at 103-105.) At trial, she and Liu attempted to change that testimony by asserting that Li worked part-time after 2012. (Tr. I at 38, 107; Tr. II at 48.) The trial testimony is not credible in light of the prior inconsistent testimony. Given this direct contradition, there is no credible justification for these payments to Li.

In 2013, Aceco also made sixteen payments of $1,273.80 each to a woman named Lea Tee (a/k/a Mei), totaling $20,380.80. (Pl.'s Exh. 25, 25A.) Mei had also been an employee of Aceco from 2005 until the end of 2012. Liu and Yu testified that she then began working part-time, yet continued to be paid her full-time salary. (Tr. I at 38, 100, 107, 108; Tr. II at 48, 49.) Liu claimed that it was because Mei was coming in to work at night to contact factories in China, and "of all the employees, [s]he was the most dedicated." (Tr. II at 49.) As with Li's employment in 2012,

9

however, Liu and Yu's trial testimony is incredible in light of Yu's deposition testimony.

Mei also received a $21,000.00 bonus on November 20, 2013, after she left Aceco. (Defs.' Exh. H11.) Liu testified that these payments were "to show our appreciation for her work, to show our appreciation for all the years, all the work she provided." (Tr. II at 67.) Given that Defendants chose to pay this former employee a "bonus" while not paying Plaintiff's outstanding invoices, there is no legitimate business purpose to this payment either.

9. <u>Other Payments by Aceco to Friends and Family</u>

Aceco's money was also used to make a number of other payments to Liu and Yu's friends and family without a legitimate business purpose.

i. A "Transaction Advice" notice from Aceco's bank shows that on January 25, 2013, June Yin ("a very old friend of ours" (Tr. II at 56)) paid Aceco $200,000.00 as "Loan to CC/Aceco." (Defs.' Exh. U, Bates 347.) A partial bank statement and Chase Online wire request indicate that three months later, on April 25, 2013, Aceco paid June Yin $204,000.00, with a message to recipient that stated, "Repay Note due on April 26, 2013." (Defs.' Exh. U, Bates 349; Tr. III at 15.) This amounted to a three-month loan at an effective interest rate of 8% and profit of $4,000.00 only three months later. (Tr. II at 135; Tr. III at 15.) Liu acknowledged that the interest rate paid to friends was between 8% and 10%. (Tr. III at 94.) Liu claimed that "Aceco used the funds to repay bank loans, pay factories in China, as well as for company operations." (Tr. II at 57.) No evidence was presented to support this assertion of how the funds were used. The Court also notes that Aceco repaid this loan to Liu's "old friend," with interest, at a time when it was not paying Plaintiff's outstanding invoices. (Tr. II at 75.)

ii. A "Transaction Advice" document from the same bank confirms a transfer of $100,000.00 from Yuk Ping Sze (Vicky Zhang's sister) or her husband Hak Luen Sze to Aceco on December 20, 2011. (Defs.' Exh. V, Bates 353.) On June 22, 2012, six months later, Aceco transferred

10

$105,125.00 to the Szes. (Pl.'s Exh. 32.) If this was in fact a loan repayment, as Liu claimed, the effective interest rate would be 10.25% with a $5,125.00 profit to the Szes. There was no legitimate business purpose for the loan or for the interest paid.

    iii. Plaintiff also introduced several checks, produced by Defendants in discovery, that show payments by Aceco to some of the same friends and family members. On December 26, 2012, for example, Aceco paid Bryan and Betty Lin $5,000.00 (Pl.'s Exh. 29); on December 31, 2012, it paid Qi-Kun Tang $600.00 (*id.*); on February 26, 2013 it paid Fan Zhang $1,777.76 (*id.*). The memo lines of these checks read "interest," but there was no evidence of related loans to Aceco for which interest could accrue. Liu acknowledged additional fund transfers out of Aceco in the amounts of $130,000.00, $70,000.00, and $300,000.00, but it is unclear to whom those transfers were made.

    Liu and Yu also made half-hearted attempts to create the appearance of "loans" after the fact. They introduced a bank statement indicating transfers to Aceco on December 28, 2012 of $100,000.00 and $50,000.00. (Defs.' Exh. L, Bates 229.) The names "Yuk Ping Sze" and "Juan Huang" are handwritten onto those bank statement entries. (*Id.*; Tr. III at 5.) However, there are no deposit slips, canceled checks, or transfer records to substantiate that these individuals actually provided those funds to Aceco. (Tr. II at 88.) There are also no loan agreements to substantiate these "loans." (Tr. II at 74.) There is a check dated January 18, 2013 from Aceco to Juan Huang for $50,288.00 with a memo line: "Repay Note." (Pl.'s Exh. 29.) However, if this was indeed repayment for the "loan" of three weeks earlier, the repayment would reflect an interest rate of approximately 10% and a profit of $288.00. Liu similarly claimed that a credit to Aceco's bank account of $177,000.00 on April 23, 2013, followed by a notation in a bank statement of "Deposit," was from his stepson Fan Zhang. (Tr. II at 131-32.) When asked whether there was a deposit slip to substantiate the source of the funds, Liu stated, "I don't have it now. However, I can provide them." (Tr. III at 86.) No slip was provided.

C. *Absence of Loan Documentation*

In light of the paucity of documentary support for their alleged loans, Liu and Yu rely heavily on peripheral documents. As Liu put it, "No notes, but we do have bank records." (Tr. II at 54.) However, the haphazard, incomplete, and confusing nature of the bank records provided by Liu and Yu shows the futility of trying to piece together from bank records and their testimony alone this web of alleged loans to Aceco.

Statements that Plaintiff obtained directly from Aceco's banks show multiple transfers into and out of Aceco's accounts. Liu and Yu point selectively to some such transfers and call them "loans" to Aceco from friends and family. However, there was rarely, if ever, corroboration of Liu and Yu's self-serving characterization. The source of many of the transfers to Aceco is not apparent from the statements. Many were, or could have been, from Aceco's factor, Financial One of New York ("FINY"). (Tr. III at 94, 126.) Liu conceded that he cannot tell from the bank statements whether money came from the factor or from some other source. (Tr. III at 95, 126.) When Liu was questioned, for example, about transfers to Aceco's bank account that included a January 14, 2013 transfer for $245,000.00, and January 8, 2013 transfers for $172,000.00, $276,000.00, and $200,000.00, he testified that they were most likely from the factor. (Tr. III at 96.)

Liu and Yu try to explain away the lack of documentation by resorting to reliance on the supposed "Chinese tradition that loans between families don't usually write a note, promissory note."[5] (Tr. II at 54.) Whatever such traditions might be among close family members, such politesse does not apply to any loans to a *corporate* entity, which has its own record-keeping responsibilities. The paper trail of loans to Aceco was at best chaotic, and at worst non-existent. Aceco's corporate records, unconstrained by Chinese tradition, do not support any legitimate

---

[5] Apparently, an exception was made for the "Personal Loan Interest Agreement," dated January 1, 2008, between Aceco and Yu's son and daughter-in-law, Fan Zhang and Yuk Mui Chan. (Pl.'s Exh. 28.)

12

business purpose for all these payments. The Court finds that such loans were rarely real, and that money flowed out of Aceco, not for repayment of legitimate loans, but for the benefit of Yu, Liu, their family, and friends.

**II.     Legal Framework**

"The concept of piercing the corporate veil is a limitation on the accepted principle that a corporation is independent of its owners and that, as a separate legal entity, the owners are normally not liable for the corporation's debts." *Balmer v. 1716 Realty LLC*, No. 05-CV-839 (NG)(MDG), 2008 WL 2047888, at *4 (E.D.N.Y. May 9, 2008).  Because New York courts are "reluctant to disregard the corporate form," *id.*, a party seeking to pierce the corporate veil and hold the corporation's owners personally liable for the corporation's debts faces a "heavy burden," *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 871 F. Supp. 2d 103, 124 (E.D.N.Y. 2012). "Nevertheless, courts will pierce the corporate veil whenever necessary to prevent fraud or achieve equity." *Id.* (internal quotations omitted).

Because the concept of piercing the corporate veil is an equitable one, "the decision to [do so] is not reduced to definitive rules but will necessarily depend on the attendant facts and equities." *Balmer*, 2008 WL 2047888, at *4 (internal quotations omitted).  The "ultimate question…is whether 'in light of the circumstances, the policy behind the presumption of corporate independence and limited shareholder liability – encouragement of business development – is outweighed by the policy justifying disregarding the corporate form – the need to protect those who deal with the corporation.'" *Id.*, at *7, quoting *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993).  The party seeking to pierce the corporate veil in New York must generally show that:  (1) the owners of the corporation exercised complete domination of the corporation with respect to the transaction at issue, and (2) the domination was used to commit a fraud or wrong that injured that party. *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir.

2001); *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

    *A. Complete Domination*

Whether the owners of a corporation completely dominated the corporation is a fact-specific inquiry. *MAG Portfolio*, 268 F.3d at 63. Courts consider a multitude of factors, which may include:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). *See also MAG Portfolio*, 268 F.3d at 63; *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997); *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp. 2d 361, 375 (E.D.N.Y. 2013). "No one factor is decisive," *Freeman*, 119 F.3d at 1053, nor is a party seeking to pierce the corporate veil required to demonstrate all ten factors, *see Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F. Supp. 2d 308, 319 (E.D.N.Y. 2010).

    *B. Fraud or Wrong*

The party seeking to pierce the corporate veil must also demonstrate that the dominating owner used the domination to commit the fraud or wrong that injured the party seeking the veil-piercing. That is, the party must show that the dominating owners, "through their domination, abused the corporate form to perpetrate a wrong or injustice against [the party] such that a court in equity will intervene." *First Keystone*, 871 F. Supp. 2d at 126-27. Actual fraud need not be demonstrated. *See Olympia*, 724 F. Supp. 2d at 319. Rather, the party "may demonstrate a non-

14

fraudulent wrong attributable to the defendant's complete domination of the corporation in question." *First Keystone*, 871 F. Supp. 2d at 127.

"Under New York law, the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced." *First Keystone*, 871 F. Supp. 2d at 127, quoting *Olympia*, 724 F. Supp. 2d at 320. A fraud or wrong has also occurred when a plaintiff's inability to collect on a judgment is "adequately linked to affirmative acts taken by Defendants….Under New York law, that is sufficient to pierce the corporate veil." *Am. Federated Title Corp. v. GFI Mgmt. Svcs., Inc.*, 39 F. Supp. 3d 516, 527 (S.D.N.Y. 2014). Such affirmative acts include using the corporation's money for items such as "transfers, management fees, and expense payments." *Id.*

## III. Conclusions of Law

### A. Complete Domination

Applying the factors articulated in *Passalacqua*, the Court concludes that Liu and Yu completely dominated Aceco. Aceco had an "absence of the formalities and paraphernalia that are part and parcel of the corporate existence." There is no evidence that Aceco maintained corporate records, held board meetings or shareholder meetings, formally elected directors, or issued stock. The only shareholders, directors, and officers of Aceco were Liu and Yu, who testified that they made all decisions for Aceco.

Aceco guaranteed the debts of other corporations in which Liu and Yu had an interest, such as RA. At the same time, Aceco was inadequately capitalized, as is evident from its ongoing inability to pay its debts. Money was put in and taken out of Aceco for personal use – such as the payment by Aceco of Liu and Yu's personal loan, the supposed HELOC, and Mo Dai Li and Qi-Kun Tang's personal loan. Money was also used to make payments to an assortment of family and friends, including Yu's son and daughter-in-law, and that daughter-in-law's sister and her husband.

Liu and Yu's reliance on customs governing family relations shows just how flimsy the corporate veil truly was: there was no separation between the individuals, Liu and Yu, and the corporation. They freely characterize these financial arrangements as *between family members*, rather than between a family member and the corporation.

The Court concludes that Aceco was completely dominated by Liu and Yu.

B. *Fraud or Wrong*

Using this domination over Aceco, Liu and Yu took affirmative steps to make it impossible for Plaintiff to collect on any judgment against Aceco. While not paying Plaintiff for its outstanding invoices, Liu and Yu chose to have Aceco pay off their personal loan, their HELOC, and the personal loan of Li and Tang. They chose to pay Li and Mei salaries even after they no longer worked for Aceco. They had Aceco make payments to RA, KPM, and MER – entities owned by family and friends – and for RA's mortgage. And they paid their friends and family – such as Fan Zhang and Vicky Zhang, June Yin, Yuk Ping Sze and Hak Luen Sze – hundreds of thousands of dollars directly. Liu and Yu claim that those payments were for loans to Aceco, but based on the evidence before it, the Court cannot conclude that these were *bona fide* loans, or in many cases that there were any loans at all. Moreover, even if there were loans, Liu and Yu's family and friends were receiving high interest rates that benefited them for loans that did not benefit Aceco.

Liu and Yu abused the corporate form to drain money from Aceco to make it and AIC judgment proof. Accordingly, the Court concludes that Liu and Yu used their domination of Aceco to commit a wrong that injured Plaintiff.

## **CONCLUSION**

Liu and Yu completely dominated Aceco, and used that domination to avoid paying Plaintiff. An equitable result is possible only if Plaintiff can enforce its judgment against Liu and Yu individually. The Court therefore concludes that Plaintiff may pierce the corporate veil, and hold

Liu and Yu personally liable for the judgment against Aceco and AIC.

       **SO ORDERED:**

       *Peggy Kuo*
       PEGGY KUO
       United States Magistrate Judge


Dated: Brooklyn, New York
    March 30, 2017